J-S40033-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| GARY LEE GERBER, JR. | : | |
| | : | |
| Appellant | : | No. 3201 EDA 2016 |

Appeal from the PCRA Order September 26, 2016
In the Court of Common Pleas of Monroe County
Criminal Division at No(s):  CP-45-CR-0000112-2007

BEFORE:   OTT, DUBOW, JJ., and STEVENS, P.J.E.[*]

MEMORANDUM BY OTT, J.:                    **FILED NOVEMBER 21, 2017**

Gary Lee Gerber, Jr., appeals from the order entered September 26, 2016, in the Monroe County Court of Common Pleas, denying his first petition for collateral relief filed pursuant to the Post Conviction Relief Act ("PCRA").[1] Gerber seeks relief from the judgment of sentence of life imprisonment following his conviction of first-degree murder[2] for the August 1993 death of Robert Hagan.  On appeal, Gerber raises several allegations of trial counsel's ineffectiveness.[3]  For the reasons below, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] **See** 42 Pa.C.S. §§ 9541-9546.

[2] 18 Pa.C.S. § 2502.

[3] It is important to note that while Gerber challenges numerous decisions made by counsel during the course of his trial, he does not assert counsel's overall defense strategy, was ineffective.

The facts underlying Gerber's arrest and conviction were recounted by a panel of this Court in the memorandum decision affirming Gerber's conviction on direct appeal:

The majority of the facts are not in dispute: in the early morning hours of August 13, 1993, [Gerber] was alone[ ] with the victim in the victim's vehicle while parked along Rimrock Road in Monroe County. At some point while inside the vehicle, [Gerber] "lashed out" on the victim, stabbing him four times in the back [7] .... [Gerber] admitted stabbing the victim. [Gerber] also cut the victim's throat in a manner that showed no sign of hesitation; the victim's neck wound was characterized as a superficial wound because no major arteries were cut, but the area had many blood vessels which would have resulted in fairly profuse bleeding. These stab wounds were potentially lethal because [of] the amount of hemorrhaging and blood loss the victim suffered, as well as his collapsed lung.

_____

[7] At trial, [Gerber] testified he was inebriated and parked his pickup truck in a parking lot. Two men approached, told him he could not park there and they would give him a ride, and helped him into what he believed was the victim's car. The next thing [Gerber] remembered was waking up in the victim's car, his pants and underwear were pulled down, "somebody was on top of" him and "trying to force something into" him, and he felt "excruciating pain." On appeal, [Gerber] avers the victim was "trying to homosexually rape him."

_____

After being stabbed, the victim exited the car and fled. The victim's body was eventually found on a bridge on Rimrock Road approximately 290 feet away from where [Gerber] stabbed the victim. Blood drops were found in various locations along the road leading toward the bridge on Rimrock Road. [I]t was determined [the victim] had suffered massive injuries to his head, *i.e.* a crushed skull and brain, and massive injuries to his torso, *i.e.,* a crushing injury to his entire side of his chest. These injuries were consistent with him being run over by a car.

[Gerber] stated that, after he stabbed the victim, he got into the driver's seat of the victim's vehicle and drove up Rimrock Road toward Route 611, which is the same direction where the victim's body was found. Thereafter, [Gerber] drove the vehicle to his father's junkyard and wiped down the interior of the car to clean off the blood. [Gerber] stated that he only cleaned off the steering wheel and the shifter of the vehicle, but also noted that the "car [was] like forensically clean like somebody who knew what they were doing did it." Although [Gerber] only admits having wiped down the interior of the vehicle, [Gerber's] father testified that he also observed [Gerber] wiping down the car from the outside. Additionally, wipe marks were found on the passenger door window of the victim's vehicle and blood was present on the front license plate of the vehicle in a manner that was consistent with someone wiping the license plate. Finally, [Gerber] admitted "getting rid of the car" by dumping it along Schaffer's School House Road.

_____

[Gerber] testified that he never felt an impact of hitting a body that night, but he did admit that he could have driven through a "brick wall [because he] was so [expletive] scared that night."

_____

In his closing argument, [Gerber's] trial counsel made clear that the majority of these facts were not in dispute. However, the [d]efense argued that [Gerber] stabbed the victim in self[-]defense, believing that he was being sexually assaulted by the victim. [Gerber] claims that he began driving the victim's car, but never knew that he hit the victim because of his emotional state after being sexually assaulted and because of the foggy weather conditions that morning. Finally, [Gerber] claims that he dumped the vehicle on Schaffer's Schoolhouse Road because his father told him to and that he never came forward to the police with his self-defense claim because he was ashamed of being sexually assaulted.

We emphasize that at trial, [Gerber] admitted to hitting the victim with the car but averred he did not know he hit him.

***Commonwealth v. Gerber***, 118 A.3d 440 (Pa. Super. 2015) (unpublished

memorandum at *1-*2) (quotation and record citations omitted).

The tortured procedural history of this appeal is as follows. Although the victim was murdered on August 8, 1993, the crime remained unsolved for more than a decade until 2006, when the Pennsylvania Office of the Attorney General uncovered evidence related to the crime during the investigation of another matter.[4] In November of 2006, a state investigating grand jury approved a presentment recommending a charge of criminal homicide against Gerber for the victim's murder. A criminal complaint followed shortly thereafter.

On March 20, 2008, Gerber entered a guilty plea to one count of third-degree murder. However, one week before his scheduled sentencing hearing, Gerber filed a motion to withdraw the plea. On June 17, 2008, the trial court conducted a hearing and denied Gerber's motion. The court sentenced Gerber that same day to a term of 10 to 20 years' imprisonment. On appeal, a panel of this Court vacated the judgment of sentence, finding Gerber cited fair and just reasons for the pre-sentence withdraw of his plea. *See Commonwealth v. Gerber*, 981 A.2d 312 (Pa. Super. 2009). The Supreme Court subsequently denied the Commonwealth's petition for allowance of appeal. *See Commonwealth v. Gerber*, 989 A.2d 915 (Pa. 2010).

---

[4] We note Gerber was subpoenaed to testify before a Monroe County grand jury investigating the murder in 1995. *See* N.T., 7/12/2010, at 122. At that time, he denied any knowledge of the crime. *Id.* at 130-131.

- 4 -

Upon remand, Gerber withdrew his guilty plea and the case proceeded to a jury trial on one count of criminal homicide.[5] On July 14, 2010, the jury found Gerber guilty of first-degree murder. The trial court sentenced Gerber to a term of life imprisonment on September 7, 2010. Gerber filed post-sentence motions, which the trial court denied following a hearing. Thereafter, Gerber filed a timely direct appeal. However, while that appeal was pending, Gerber filed a petition for remand for consideration of newly discovered DNA evidence. By order dated February 27, 2012, this Court granted Gerber's petition, vacated his sentence, and remanded for an evidentiary hearing. *See* Order, 2/27/2012. Specifically, this Court directed the trial court "to determine if a new trial is warranted based on after-discovered evidence pursuant to the four factors set forth in ***Commonwealth v. Pagan***, [] 950 A.2d 270, 292 ([Pa.] 2008)[,]" and either "order a new trial or re-impose sentence." Order, 2/27/2012.

Upon remand, the trial court conducted an evidentiary hearing on July 18, 2012. Subsequently, on November 14, 2012, the court denied Gerber's claim of after-discovered evidence and re-imposed the judgment of sentence of life imprisonment. On December 7, 2012, Gerber requested permission to file post-sentence motions *nunc pro tunc*. The trial court granted the request,

---

[5] The verdict sheet permitted the jury to find Gerber guilty of either first-degree murder, third-degree murder, or voluntary manslaughter. ***See*** Verdict Sheet, 7/14/2010.

and Gerber filed additional post-sentence motions on February 1, 2013.[6] In an order dated March 6, 2013, the trial court granted Gerber relief on his claim that he was not permitted to address the court prior to re-sentencing. Accordingly, the court vacated the sentence and scheduled a new sentencing hearing for March 18, 2013. At that hearing, the trial court again imposed a sentence of life imprisonment. Thereafter, on April 24, 2013, the court entered an order dismissing the remaining claims in Gerber's post-sentence motions, as they all invoked challenges to the effective assistance of counsel and had to be raised in a collateral proceeding. A panel of this Court affirmed the judgment of sentence on direct appeal. **See Gerber**, **supra**, 118 A.3d 440.

On July 27, 2015, Gerber filed the instant PCRA petition, his first, raising eight claims asserting the ineffective assistance of trial counsel. An amended petition followed on October 23, 2015. The PCRA court conducted three days of evidentiary hearings, on February 17, 2016, May 25, 2016, and May 26,

---

[6] As this Court noted on direct appeal, the trial court should not have allowed Gerber to file additional post-sentence motions on remand because the remand order specifically directed the trial court to either order a new trial or re-impose the sentence. Accordingly, "[Gerber] should have filed a notice of appeal within thirty days of the court's denial of his motion based on newly-discovered DNA evidence and re-imposition of sentence." **Gerber**, **supra**, 118 A.3d 440, at *3. Nonetheless, we declined to quash the appeal "because the trial court perpetuated the error by specifically granting [Gerber] leave to file post-sentence motions nunc pro tunc and then denying them on the merits." **Id.**

2016, respectively. Subsequently, on September 27, 2016, the PCRA court entered an order denying Gerber relief. This timely appeal follows.[7]

"In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination is supported by the record and free of legal error." **Commonwealth v. Mitchell**, 141 A.3d 1277, 1283–1284 (Pa. 2016) (internal punctuation and citation omitted). Where, as here, all of the claims on appeal assert trial counsel's ineffectiveness, we must bear in mind:

> "In order to obtain relief under the PCRA premised upon a claim that counsel was ineffective, a petitioner must establish beyond a preponderance of the evidence that counsel's ineffectiveness 'so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.'" **Commonwealth v. Payne**, 794 A.2d 902, 905 (Pa. Super. 2002), *quoting* 42 Pa.C.S.A. § 9543(a)(2)(ii). When considering such a claim, courts presume that counsel was effective, and place upon the appellant the burden of proving otherwise. **Id.** at 906. "Counsel cannot be found ineffective for failure to assert a baseless claim." **Id.**
>
> To succeed on a claim that counsel was ineffective, Appellant must demonstrate that: (1) the claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) counsel's ineffectiveness prejudiced him. **Commonwealth v. Allen**, 833 A.2d 800, 802 (Pa. Super. 2003).

**Commonwealth v. Michaud**, 70 A.3d 862, 867 (Pa. Super. 2013). Furthermore, "[t]o demonstrate prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's actions or inactions, the

---

[7] On October 12, 2016, the PCRA court ordered Gerber to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Gerber complied with the court's directive and filed a concise statement on October 24, 2016.

result of the proceeding would have been different." ***Commonwealth v. Mason***, 130 A.3d 601, 618 (Pa. 2015).

In his first issue on appeal, Gerber contends trial counsel was ineffective for failing to object to the testimony of Pennsylvania State Police Sergeant Frank DeAndrea. First, Gerber argues Sergeant DeAndrea inappropriately provided expert testimony on issues concerning the crime scene, and his opinion that Gerber ran over the victim twice. Gerber claims the officer's testimony was improper because: (1) the Commonwealth did not offer Sergeant DeAndrea as an expert witness or provide Gerber with a pretrial report discussing the officer's findings; (2) the officer was not qualified to testify as an expert; (2) the officer did not offer his opinions within a reasonable degree of certainty; and (3) the trial court did not instruct the jury that the officer was an expert witness. ***See*** Gerber's Brief at 12-29. Second, Gerber contends that even if Sergeant DeAndrea's testimony did not constitute an expert opinion, the officer provided improper lay opinion testimony. ***See id.*** at 29-36. In either case, Gerber insists trial counsel had no reasonable basis for failing to object to Sergeant DeAndrea's testimony, and Gerber was prejudiced as a result. ***See id.*** at 36-41.

Preliminarily, we note decisions concerning the admissibility of evidence are within the sound discretion of the trial court. ***Commonwealth v. Brown***, 134 A.3d 1097, 1105 (Pa. Super. 2016), *appeal denied*, 145 A.3d 161 (Pa. 2016). Here, the court found Trooper DeAndrea did not testify as an expert

- 8 -

witness at trial, but rather the trooper "gave permissible lay witness testimony[.]"  PCRA Court Opinion, 9/26/2016, at 12.  We agree.

When a witness's testimony is based upon "scientific, technical, or other specialized knowledge [] beyond that possessed by the average layperson," the witness must be qualified as an expert "by knowledge, skill, experience, training or education."  Pa.R.E. 702(a).  Nevertheless, Pennsylvania Rule of Evidence 701 permits a lay witness to offer opinion testimony so long as the opinion is:

> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701.  Further, this Court has noted that "lay opinion testimony embracing an ultimate issue in a case is admissible as long as the witness perceived the events upon which his opinion is based."  *Commonwealth v. Bowser*, 624 A.2d 125, 133 (Pa. Super. 1993), *appeal denied*, 644 A.2d 161 (Pa. 1994), *cert. denied*, 513 U.S. 867 (1994).

This Court's recent decision in *Commonwealth v. Kennedy*, 151 A.3d 1117 (Pa. Super. 2016), is instructive.  In *Kennedy*, the trial court denied an oral motion in *limine* to preclude a police crime scene investigator from testifying regarding her observations of the trajectory of bullets fired through the victim's door.  *See id.* at 1121.  The officer later testified that "she placed rods in the bullet holes of the door" and that "the only logical conclusion based

upon the bullet trajectories, … was that the door was slightly ajar when [the defendant] shot [the victim]." *Id.* at 1122. On appeal, the defendant argued the court erred in permitting the officer to offer her lay opinion that the door was "slightly open" at the time of the shooting. *Id.* However, the panel disagreed, concluding the officer's testimony was a permissible lay opinion based on the officer's perception of the crime scene, and did not require the specialized knowledge of an expert witness. Indeed, the panel explained "[a]ny individual could place a rod in a bullet hole and discern which direction the bullet traveled." *Id.* at 1123.

In the present case, Sergeant DeAndrea testified extensively regarding his investigation and processing of the crime scene. *See* N.T., 7/8/2010, at 14-144. *See also* Gerber's Brief at 14 (stating Sergeant DeAndrea testified regarding "the appearance of the victim, the scene of the crime, and the measurements, photographs and evidence gathering he claimed he undertook."). In doing so, the officer offered his interpretations of the evidence recovered, and his opinion as to how the events leading to the victim's death unfolded. Specifically, Gerber complains the officer improperly provided "expert" testimony regarding the significance of a string found hanging from the suspension assembly underneath the victim's vehicle. *See* Gerber's Brief at 15-16. Sergeant DeAndrea testified the string was the same color and texture as the victim's pants, which had a jagged tear in the buttocks. *See* N.T., 7/8/2010, at 31-32, 99. Because he observed the string hanging from the rear portion of the suspension support bar, Sergeant

DeAndrea testified that he believed the "vehicle was traveling in reverse when it went across [the victim's] pants." *Id.* at 89. *See also id.* at 79-91. Gerber insists this opinion, as well as the officer's testimony regarding a tire impression on the victim's shirt, the state of the victim's body, and the significance of a handprint and footprint in the dirt parking lot, crossed the line into expert opinion testimony. *See* Gerber's Brief at 15, *citing* N.T., 7/8/2010, at 33-48, 53-56. Because the Commonwealth never offered Trooper DeAndrea as an expert witness, Gerber contends counsel was ineffective for failing to object to this "improper" testimony.

The PCRA court concluded, however, that Sergeant DeAndrea gave "permissible lay witness testimony." PCRA Court Opinion, 9/26/2016, at 12. The court explained:

> In this case, the Commonwealth called [Sergeant] DeAndrea to testify regarding the state of the crime scene on August 8, 1993 and the actions he took that day. [Sergeant] DeAndrea is … a member of the identification unit, which is involved in processing crime scenes. That day, [Sergeant] DeAndrea's duties included the documentation, collection and preservation of evidence.
>
> [Gerber] complains that [Sergeant] DeAndrea gave numerous expert opinions, which should have only been admissible under Pa.R.E. 702. We disagree. While subject to both direct and cross examination, [Sergeant] DeAndrea explained the actions he took on August 8, 1993 and at times, rendered certain opinions. [Sergeant] DeAndrea, however, answered the questions posed in terms of what was "apparent" based on his application of common sense and logic to his physical observations. These opinions were rationally based on the perceptions he made that day and presented in terms of what he believed based on his knowledge and experience as a trooper for 22 years with the Pennsylvania State Police. Each opinion

- 11 -

rendered involved the use of common sense and logic. The term "common sense" itself is defined as sound practical judgment that is independent of specialized knowledge, training, or the like. The appellate courts have distinguished between a witness' conclusion that is cast in the form of an appearance and one that is cast as an absolute statement of fact, holding that the former is admissible as lay opinion while the latter may require the expertise covered by Pa.R.E. 702.

[Sergeant] DeAndrea's statements to the jury constituted lay opinion testimony that was fully admissible under Pa.R.E. 701. None of his testimony required knowledge beyond that possessed by laypersons. Accordingly, [Sergeant] DeAndrea was properly treated as a lay witness … [and trial counsel] cannot be ineffective for not objecting to his testimony on those grounds.

*Id.* at 14-15 (footnote and citations omitted).

We find no basis to disturb the ruling of the PCRA court. Sergeant DeAndrea's testimony was grounded upon his observations at the crime scene. While he provided his opinion regarding the significance of certain evidence, all of those opinions were rationally based on his personal observations and did not require specialized knowledge.

Gerber cites numerous cases for the proposition that a police officer who is not qualified as an expert witness "can testify only as to the facts he personally observed and cannot give an opinion to causation." Gerber's Brief at 30. *See also id.* at 33-35 (collecting cases). Indeed, it is well-established that "an investigating police officer who did not witness an accident may not render an opinion at trial as to its *cause* unless he/she has been qualified as an expert." *McKee by McKee v. Evans*, 551 A.2d 260, 264 (Pa. Super. 1988) (*en banc*) (emphasis in original), *appeal denied*, 562 A.2d 824, 827 (Pa. 1989). Nevertheless, an officer investigating a motor vehicle accident may

provide lay opinion testimony regarding the point of impact so long as the opinion is based on "discernible factors." *Id.* at 265. In **McKee**, **supra**, this Court identified relevant "discernible factors" as the officer's observations of "debris on the roadway, the positions of the respective vehicles" when the officer arrived on the scene after the impact, and the officer's "conversations" with eyewitnesses. *Id.*

Here, Gerber concedes Sergeant DeAndrea "did not testify as to the 'point of impact' of the vehicle and [the victim]." Gerber's Brief at 32. However, he complains the officer *implied* the impact occurred "on the berm of the road" without sufficient facts to justify his opinion.[8] *Id.* Moreover, Gerber insists Sergeant DeAndrea's testimony regarding his conclusion that the vehicle rolled over the victim twice, based solely on his observation of a string hanging from the axle, "clearly went well beyond the scope of allowable testimony as to the 'point of impact' … but rather described how and where the vehicle moved and in what directions." *Id.* at 36.

We conclude, however, that Gerber's argument implicates the weight of Sergeant DeAndrea's testimony, not its admissibility. Sergeant DeAndrea testified regarding his observations of the victim's body when he arrived at the crime scene, as well as a blood trail leading back to the dirt parking lot, where he saw tire tracks, a footprint (which appeared to match the victim's

---

[8] Gerber maintains Sergeant DeAndrea's testimony that the impact was "off of the roadway and on the berm" was "critical" in supporting the Commonwealth's argument that Gerber intentionally struck the victim. Gerber's Brief at 32.

sneakers), and a handprint. **See** N.T., 7/8/2010, at 15-23. He further testified regarding his observations of a pattern injury on the victim's temple (which resembled the front license plate cover of his car), a tire impression on the victim's shirt, black dirt and a tear on the victim's pants, and the position of the victim's body near the curb. **See id.** at 28-36. Moreover, Sergeant DeAndrea's conclusion that the vehicle traveled over the victim forward and backwards was based upon the location of the string he found attached to the rear of the support bar, and the pattern observed on the victim's head and shirt. He stated:

> [W]e realized that his head has been hit, the patterning injury that resembles the front license plate cover, and we know that a tire traveled over his torso because his ribs are crushed and the tire impression is left on his shirt.
>
> Recognizing that if the vehicle is traveling towards 611 there's no way for the driver's side to be crushing him here without the passenger's side being off the bridge, it only makes sense that the passenger's side is what struck his head with the license plate on the passenger's side front bumper. The front tire could run over his head, and the rear passenger's side would simply run over his shirt.
>
> The problem becomes that the distance from this tire to this tear is about 30 inches, and the distance from the rear tire to the thread is only 8. So you can certainly say that that had to be made by the front license plate coming in contact with his head and that a tire -- a rear tire had to run over his torso if that's hit with his head.
>
> But there's no way that the front passenger's side can hit his head and then the right rear tire run over his shirt and at the same time tear his pants and cause the patterning injury along with making the fiber be attached to that piece of steel. The only way for that to happen is to have the vehicle with the right rear tire hit him twice.

- 14 -

*Id.* at 90-91. The officer further stated the location of the fiber on the rear support bar indicated the vehicle was traveling "backwards" when the string attached to the bottom of the vehicle. *Id.* at 91. It is evident that Sergeant DeAndrea's "opinion" regarding the vehicle's impact with the victim was based on both his observations at the scene of the crime and his inspection of the victim's car, and was properly admitted as lay opinion testimony. To the extent Gerber claims the officer's testimony was inconsistent with the evidence, that argument, again, implicates the weight to be afforded Sergeant DeAndrea's testimony, not its admissibility. Accordingly, Gerber's first ineffectiveness claim has no arguable merit.[9] *See Michaud*, *supra*.

Next, Gerber contends trial counsel was ineffective for failing to present expert rebuttal testimony from a forensic pathologist and an accident reconstructionist. *See* Gerber's Brief at 41. In support of this claim, Gerber obtained expert reports from forensic pathologist, Dr. Cyril Wecht, and accident reconstructionist, James Baranowski, and called both experts to testify regarding their opinions at the PCRA hearing. *See* N.T., 5/25/2016, at 4-43, 143-192. He insists the testimony of both experts was necessary to

---

[9] We also note that during the PCRA hearing, trial counsel testified he had a reasonable basis for failing to object to Sergeant DeAndrea's testimony regarding the movement of the vehicle, namely that he believed the expert witness coroner would contradict the officer's opinion. *See* N.T., 5/25/2016, at 75-76, 81. Further, counsel testified he did not believe the officer's testimony regarding the location of blood drops on the berm of the road was significant because his defense was that Gerber did not see the victim when he struck him with the vehicle. *Id.* at 67. Therefore, we could also conclude Gerber failed to establish the second prong of the ineffectiveness test*. See Michaud*, *supra*.

contradict the "very prejudicial opinions" of Sergeant DeAndrea that the victim was run over more than one time, and that the impact was on the berm of the road. *Id.* at 43.

Our review of an allegation that trial counsel was ineffective for failing to present expert witnesses in rebuttal is well-established:

> "Where a claim is made of counsel's ineffectiveness for failing to call witnesses, it is the appellant's burden to show that the witness existed and was available; counsel was aware of, or had a duty to know of the witness; the witness was willing and able to appear; and the proposed testimony was necessary in order to avoid prejudice to the appellant." "The mere failure to obtain an expert rebuttal witness is not ineffectiveness. Appellant must demonstrate that an expert witness was available who would have offered testimony designed to advance appellant's cause." "Trial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony. Additionally, trial counsel will not be deemed ineffective for failing to call a medical, forensic, or scientific expert merely to critically evaluate expert testimony [that] was presented by the prosecution. Thus, the question becomes whether or not [defense counsel] effectively cross-examined [the Commonwealth's expert witness]."

*Commonwealth v. Chmiel*, 30 A.3d 1111, 1143 (Pa. 2011) (internal quotations omitted).

Here, the PCRA court found Gerber's claim failed for several reasons. First, Gerber did not establish during the PCRA hearing that either Dr. Wecht or Mr. Baranowski were available and willing to testify on Gerber's behalf at the time of trial. *See* PCRA Court Opinion, 9/26/2016, at 29-30, 34. We agree his preliminary omission is fatal to his claim. *See Commonwealth v. Wayne*, 720 A.2d 456, 470 (Pa. 1998) (finding ineffectiveness claim failed

when appellant did not "establish that counsel knew or should have known of the existence" of potential alibi witness), *cert. denied*, 528 U.S. 834 (1999).

With respect to Dr. Wecht, the court also determined that his expert testimony was not necessary because trial counsel "effectively cross-examined" the Commonwealth's expert forensic pathologist, Dr. Isidore Mihalikis. ***Id.*** at 31. At the PCRA hearing, Dr. Wecht opined the victim was lying on the ground when he was struck once by a vehicle, with the front right wheel crushing his head and the rear right wheel striking his "thoracic area." N.T., 5/25/2016, at 18-19. Further, he testified he believed there would have been additional injuries if the victim had been struck a second time. ***See id.*** at 29. Dr. Wecht's trial testimony was similar, in all relevant aspects, to Dr. Mihalikis's testimony. On direct examination, Dr. Mihalikis testified that he did not see "any evidence there was any upright impact" on the victim, *i.e.*, he concluded the victim was lying on the ground when he was struck by a car. N.T. 7/8/2010, at 163. Furthermore, under cross-examination, Dr. Mihalikis agreed there were no crushing injuries or broken bones in the victim's legs or hips. ***See id.*** at 174-175. ***See also id.*** at 176 (agreeing "the lower extremities of the [victim's] body from … the waist down was not wheel run over"). The PCRA court opined this testimony, "that the [v]ictim did not suffer any crushing injuries from the waist down, [] militate[d] the theory that [Gerber] backed the vehicle over the [v]ictim." PCRA Court Opinion, 9/26/2016, at 31. Accordingly, we agree with the PCRA court that Gerber's

asserderton trial counsel was ineffective for failing to present Dr. Wecht's testimony on rebuttal has no arguable merit.

With respect to Mr. Baranowski, we agree with Gerber that his proposed testimony directly contradicted Sergeant DeAndrea's testimony concerning the significance of the string recovered from the rear support bar, the point of impact with the victim (*i.e.*, on the roadway rather than the berm of the road), and the number of times Gerber ran over the victim. **See** Gerber's Brief at 43; N.T., 5/25/2016, at 156-158. However, although we find portions of his testimony may have been helpful to the defense, we still agree with the PCRA court that trial counsel had a reasonable basis for not calling Mr. Baranowksi as a rebuttal witness, namely his version of the accident would have directly contradicted the defense. **See Chimel**, **supra**, 30 A.3d at 1143 ("Appellant must demonstrate that an expert witness was available who would have offered testimony designed to advance appellant's cause.").

Mr. Baranowksi opined the victim was standing in the roadway when he was struck by the vehicle. **See** N.T., 5/25/2016, at 173. Furthermore, he testified that based on the skid marks in the roadway, he believed Gerber applied the brakes **after** he struck the victim. **See id.** Mr. Baranowski stated that when Gerber struck him, the victim was "probably lifted up onto the hood for a short time period, traveled with the vehicle as it slowed, he went down in front of the vehicle, and the vehicle traveled over top of him." **Id.** at 173.

This version of the accident directly contradicted Gerber's defense, which trial counsel explained as follows:

> The defense was that [Gerber] acted in self-defense as far as the stabbing was concerned and that he had no intent, and that he claimed that he had no knowledge whatsoever that he had ran over Mr. Hagan on the bridge. It was foggy. **He claimed that he did not see him. He did not feel his vehicle go over him.** He did not – he didn't remember that incident.

N.T., 5/25/2016, at 49 (emphasis supplied). Accordingly, trial counsel testified he was not concerned with where the impact occurred, *i.e.*, on the roadway or berm of the road, "because it was Mr. Gerber's position that he didn't know where [the victim] was. He didn't see him." *Id.* at 57. Similarly, counsel acknowledged he made a strategic decision "not to reference any skid marks." *Id.* at 64. He stated:

> Mr. Gerber did not indicate that he saw the victim or that he made any evasive maneuver or attempted to brake his vehicle; so I would not bring that out to the jury.
>
> * * * *
>
> Mr. Gerber's position – my recollection of Mr. Gerber's position from day one is that he did not see Mr. Hagan in the roadway, did not remember running over him.

*Id.* at 64-65. *See* N.T., 7/13/2010, at 29 (Gerber testifying he did not see anyone when he drove away from the scene of the assault), at 66 (Gerber testifying he "didn't realize at the time [he] ran anyone over" and he "never knew [he] hit Mr. Hagan"), at 67 (same). Therefore, Mr. Baranowksi's testimony that (1) Gerber braked when he struck the victim, and (2) the victim's body was lifted onto the hood of the car for a short time, would have undermined counsel's defense at trial – supported by Gerber's own testimony - that Gerber was not aware he struck anyone with the vehicle. Consequently, we agree with the PCRA court that counsel was not ineffective for failing to

call either expert witness on rebuttal. *See* PCRA Court Opinion, 9/26/2016, at 25-36.

In his third issue, Gerber maintains trial counsel was ineffective for failing to effectively cross-examine Sergeant DeAndrea regarding his critical misstatement concerning the location of the trail of blood drops from the parking lot to the victim's body.[10] *See* Gerber's Brief at 45-50. Gerber insists the officer's testimony that "[a]ll of the blood that we found was on the berm side" and "not in the travel portion of the road" was directly contradicted by Commonwealth Exhibit 72, which "detailed the correct location of the blood drops." Gerber's Brief at 45 (emphasis and citations omitted). He maintains the exhibit establishes that of the 13 blood drops identified, only one was on the berm of the road, three were on the fog line, and the remaining nine were in the roadway. *See id.* at 46. Further, Gerber emphasizes that the exhibit shows skid marks were also on the roadway, "which would have established that the victim was on the roadway, not the berm, when he was struck." *Id.* at 47. Gerber contends counsel's failure to cross-examine Sergeant DeAndrea on these misstatements was prejudicial to his case because the prosecutor

---

[10] We note that in his statement of questions involved, Gerber also criticizes counsel's failure to effectively cross-examine Trooper George Surma. *See* Gerber's Brief at 4, 44. However, he fails to make any mention of Trooper Surma in the argument portion of his brief. Therefore, that claim is waived. *See Commonwealth v. Phillips*, 141 A.3d 512, 522 (Pa. Super. 2016) ("[I]ssues raised in a Brief's Statement of Questions Involved but not developed in the Brief's argument section will be deemed waived.") *appeal denied*, 161 A.3d 796 (Pa. 2016).

insisted in both his opening and closing statements that Gerber "intentionally drove the vehicle over the fog line to strike and kill the victim." *Id.* at 49.

The PCRA court concluded trial counsel had a reasonable basis for failing to cross-examine the officer about his misstatement. *See* PCRA Court Opinion, 5/26/2016, at 16-19. We agree.

As detailed above, counsel's defense strategy was to emphasize Gerber stabbed the victim in self-defense, and fled the scene unaware that he had struck the victim with the car. *See* N.T., 5/25/2016, at 49, 57. This strategy was supported by Gerber's trial testimony that he "didn't realize at the time [he] ran anyone over" and "never knew he hit the victim." N.T., 7/13/2010, at 66-67. Therefore, counsel testified he made the strategic decision not to cross-examine Sergeant DeAndrea regarding the location of the blood trail. He explained:

> I didn't feel that I should get caught up into where [the victim] was, because it was Mr. Gerber's position that he didn't know where [the victim] was. He didn't see him. So whether he was, you know, 6 inches on one side of the white line or the other or a foot on one side of the white line or the other, Mr. Gerber's defense was that he didn't see [the victim]. It was foggy.
>
> * * * *
>
> But, again, I did not want to get into an argument with the Commonwealth as to, you know, again, where exactly the blood drops were. I felt I would be falling into their trap as to whether he was on the berm or on the road surface, when the actual defense was he didn't know where [the victim] was. We didn't know where he was. Mr. Gerber testified he didn't see him. So I felt that it was somewhat immaterial as to whether or not he was, you know, again, slightly over or over the fog line one way or the other.

N.T., 5/25/2016, at 56-57, 61-62.

Based on counsel's stated strategy, the PCRA court opined:

[Defense counsel's] decision not to cross-examine [Sergeant] DeAndrea about the exact location of the blood drops was reasonable. [Gerber] was on trial for murdering the [v]ictim by stabbing him in the vehicle and, shortly thereafter, running him over with the vehicle. [Gerber's] defenses throughout the entire case were that he stabbed the [v]ictim in self-defense and he did not intend to run over the [v]ictim with the vehicle. [Gerber] testified that he did not see the [v]ictim as he was driving the vehicle, mainly due to the darkness and fog. N.T. 7/13/10, pp. 28-31, 67. Further, [Gerber] testified that he never knew he ran over the [v]ictim, stating "I was terrorized. I could have drove through the Mummers Day Parade and not even know I hit anybody I was so scared. All I wanted to do was get away." N.T. 7/13/10, p. 67. Because [Gerber] never saw the [v]ictim on or near the road, nor did he know he ran over the [v]ictim, [trial counsel] made a strategic decision not to make an issue out of whether the majority of the [v]ictim's blood drops were on the berm side or roadway side of the fog line. Therefore, [counsel] believed the blood drops were immaterial and arguing whether the [v]ictim was on the berm side or roadway side could damage the defense's theory.

For the reasons stated above, [counsel's] decision not to cross-examine [Sergeant] DeAndrea about the exact location of the blood drops was reasonable. Thus, we will not second-guess his tactics and our ineffectiveness inquiry ends.

PCRA Court Opinion, 9/26/2016, at 18-19.

We conclude the PCRA court's analysis of this claim is legally correct, and supported by the record. **See Mitchell**, **supra**. We emphasize:

"Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." **Commonwealth v. Miller**, 572 Pa. 623, 819 A.2d 504, 517 (2002). A claim of ineffectiveness generally cannot succeed through comparing, in

hindsight, the trial strategy employed with alternatives not pursued. *Id.*

*Commonwealth v. Washington*, 927 A.2d 586, 599–600 (Pa. 2007). Here, counsel's defense strategy was reasonable, particularly considering Gerber's insistence that that he did not see the victim on the roadway, and did not even realize he had struck a person on the night in question. Accordingly, this claim, too, fails.

In his penultimate issue, Gerber asserts counsel was ineffective when he failed to object to the prosecutor's repeated questions concerning Gerber's strategic discussions with trial counsel, and his previously entered guilty plea to third-degree murder. *See* Gerber's Brief at 50-57.

Specifically, Gerber contends the following exchanges during the prosecutor's cross-examination were improper:

> Q [by Prosecutor]      … Now, you've spoken to your lawyers about possible defenses in this case --- … did you not?
>
> …
>
> A [by Gerber]    I only ever had one defense.
>
> Q    Did your lawyers explain to you that if you were intoxicated to enough of a degree that it may lead to your conviction of a lesser charge?
>
> A    Well, that's why I was convicted of a lesser charge to begin with.
>
> Q    Have you gotten advice from counsel that the more drunk you were the more that might benefit you in a defense of reducing first degree murder down?
>
> A    He made me aware of that, but I made him aware I was drunk. It was never an issue of first degree because I was drunk.
>
> * * * *

Q      And your lawyers, I assume, also told you that before you could use deadly force to defend yourself that you had a duty to retreat if you could retreat.  They told you that, correct?

A      I've read the law.  He didn't tell me that.

\* \* \* \*

Q      And you realized that you're going to have a tough time explaining why you would run somebody over at a time where you had no threat.  I assume your lawyers told you that?

[Defense Counsel]:  Objection, Your Honor.

THE COURT:  Sustained.  You don't have to answer that question, Mr. Gerber.

N.T., 7/13/2010, at 60-61, 61-62, 67.  The prosecutor then proceeded to cross-examine Gerber regarding Sergeant DeAndrea's testimony that after he struck the victim, Gerber backed over him again.  Gerber testified that he "never knew [he] hit him, so [he] know[s he] didn't put it in reverse and back over him."  *Id.* at 68-69.  Thereafter, the following exchange took place:

Q [by prosecutor]      That would be pretty hard to defend, wouldn't it?

A [by Gerber]     Backing over someone?  I wouldn't – I would have took the deal that you guys offered me, and I wouldn't even be here if I was an animal like that.  I never knew I hit Mr. Hagan.

Q      What are you talking about?

A      The 10 years.

Q      What 10 years?

A      I would only – I would be released in five years from this date if the Court didn't overturn the case.

Q      Overturn what case, sir?

A      My conviction.

Q      What conviction?

- 24 -

A        When my attorney died before trial. …

Three years ago, before trial was to start, my attorney died. I was given a choice of going to trial or taking a plea agreement.

*Id.* at 69.   The prosecutor then continued to question Gerber about the circumstances surrounding his guilty plea, and referred to statements Gerber made during the plea colloquy, including his acknowledgment that he was "responsible for Mr. Hagan's death" and while he did not intend to "run over him," he did intend "to stab Mr. Hagan[.]" ***See id.*** at 75-76.

On redirect, trial counsel also asked Gerber about the guilty plea, emphasizing that he only accepted the plea because his attorney had just died, and his replacement was unprepared for trial. ***See id.*** at 143-145.  Prior to closing arguments, the parties entered into an agreement that neither attorney would refer to the withdrawn plea during closing arguments, and the trial court would charge the jury to disregard any evidence they heard regarding a prior disposition on the case. ***See id.*** at 162-164.  Pursuant to the agreement, the trial court charged the jury as follows:

During the course of the trial, you heard evidence about a prior disposition of this case.  I'm instructing you that you are to disregard any evidence that you heard regarding the prior disposition of this case.  You are to base your decision solely upon the evidence as it was introduced during the course of this trial and in accordance with my instructions.

*Id.* at 288.

With this background in mind, we consider Gerber's ineffectiveness claim on appeal, namely that the prosecutor's questions violated both attorney-client privilege and Pennsylvania Rule of Evidence 410.  Section 5916

- 25 -

of Title 42 codifies the protection of confidential communications between an attorney and his client:

> In a criminal proceeding counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client.

42 Pa.C.S. § 5916. It is well-settled that "the attorney-client privilege operates in a two-way fashion to protect confidential client-to-attorney or attorney-to-client communications made for the purpose of obtaining or providing professional legal advice." *Commonwealth v. Schultz*, 133 A.3d 294, 313 (Pa. Super. 2016). Moreover, it is well-settled that the Pennsylvania Rule of Evidence 410 prohibits reference to a defendant's prior plea agreement or statements made during plea discussions when, as here, the agreement was subsequently withdrawn. *See* Pa.R.E. 410(a)(1), (4). However, this Court has held [u]ltimately, it is clear that the rights provided for in Rule 410 are waivable." *Commonwealth v. Widmer*, 120 A.3d 1023, 1028 (2015), *appeal denied*, 158 A.3d 78 (Pa. 2016) (defendant waived right to object to admissions he made in plea proffer when, as part of the agreement, defendant acknowledged his statements could be used against him if he decided not to proceed with the plea).

In the present case, Gerber insists the prosecutor's questions were highly improper, and counsel had no reasonable basis for failing to object. *See* Gerber's Brief at 55. He further asserts his mere mention of "the deal" with the Commonwealth, did not justify the prosecutor's in-depth cross-

examination regarding statements he made at the guilty plea colloquy, which was subsequently invalidated as involuntary. *Id.* at 56. Gerber concludes:

> [His] claims of counsel ineffectiveness have arguable merit, counsel did not have a reasonable basis for failing to act, and he has suffered prejudice as a result of counsel's deficient performance for the jury was not going to accept [Gerber's] affirmative self-defense defense after hearing that he had previously pleaded guilty to third-degree murder, a malicious killing.

*Id.* at 57.

The PCRA court concluded both of these claims warranted no relief. *See* PCRA Court Opinion 5/26/2016, at 38-46. First, with respect to counsel's failure to object to questions concerning attorney-client privilege, the court acknowledged Gerber's claim had arguable merit since at least some of the prosecutor's questions inquired into the substance of Gerber's discussions with his attorney. *See id.* at 45. Nevertheless, the PCRA court concluded counsel had a reasonable basis for failing to object, and Gerber failed to demonstrate prejudice. We agree.

At the PCRA hearing, trial counsel explained why he neglected to object to the prosecutor's questions implicating attorney/client discussions:

> I felt Mr. Gerber was handling the questions. Again, you know, strategically – you know, my experience is, you know, especially when your client's on the stand and you start objecting to every question, it's the situation like you're trying to hide something. You're trying to overly protect him. Again, there are rapid-fire questions and those were the decisions that I made.

N.T., 5/25/2016, at 109. We are constrained to agree with the PCRA court that, based on the specific facts of this case, trial counsel demonstrated a

"reasonable strategic basis for his actions." PCRA Court Opinion 9/26/2016, at 45. Furthermore, and more importantly, Gerber has utterly failed to establish prejudice.[11] As the PCRA court opined:

> The Commonwealth presented other evidence for the trier of fact to find, beyond a reasonable doubt, that [Gerber] committed the offenses of which he was convicted. [Gerber] cannot show that, but for the Commonwealth's questions about [Gerber's] conversations with trial counsel, the outcome of the proceedings would have been different.

*Id.* at 46.[12] *See Mason*, *supra*.

Second, with regard to the prosecutor's questions concerning Gerber's previously withdrawn guilty plea, the PCRA court determined the claim lacked arguable merit because Gerber "unilaterally introduced his withdrawn guilty plea for his own strategic purposes." PCRA Court Opinion 9/26/2016, at 38. The court emphasized trial counsel "specifically advised [Gerber] to not discuss his withdrawn guilty plea." *Id.* at 39, *citing* N.T., 7/13/2010, at 162. Nevertheless, Gerber broached the subject twice before the Commonwealth began to question him about the prior plea. *See* N.T., 7/13/2010, at 60 (Gerber stating, "Well, that's why I was convicted of a lesser charge to begin

---

[11] We note Gerber provides no prejudice analysis in his brief specific to the attorney/client privilege issue. *See* Gerber's Brief at 50-57.

[12] The PCRA court found "there were numerous factors at trial that provide ample support for a jury to reject [Gerber's] version of the incident," including the fact that Gerber conceded he lied under oath during his prior grand jury testimony, and "the specifics of [his] story constantly evolved during the investigation process and even during his testimony at trial." PCRA Court Opinion, 9/26/2016, at 51.

with."); at 69 (Gerber stating, "I would have took the deal that you guys offered me, and I wouldn't even be here if I was an animal like that."). The Pennsylvania Supreme Court has held that once a defendant "open[s] the door" to a subject, he "cannot [later] complain because the Commonwealth chose to further examine what was behind that door." *Commowealth v. LaCava*, 666 A.2d 221, 234 (Pa. 1995). *See also Commonwealth v. Patosky*, 656 A.2d 499, 504 (Pa. Super. 1995) ("If a defendant delves into what would have been objectionable testimony on the Commonwealth's part, then the Commonwealth can probe into this objectionable area."), *appeal denied*, 668 A.2d 1128 (Pa. 1995). Indeed, the PCRA court found Gerber's unsolicited comments regarding his prior conviction were an attempt "to win favor with the jury" and "corroborate one of his multiple defenses offered at trial, i.e., that he was too intoxicated to form the requisite intent for first degree murder." PCRA Court Opinion, 5/26/2016, at 40.

Further, the PCRA court emphasized "the jury was specifically instructed to disregard any evidence with respect to the withdrawn guilty plea." *Id.* at 41. *See* N.T., 7/13/2010, at 288. "The law presumes that the jury will follow the instructions of the court." *Commonwealth v. Brown*, 786 A.2d 961, 971 (Pa. 2001). Therefore, the court concluded Gerber's claim has no arguable merit.

We find no basis to disagree. The first time Gerber mentioned he was "convicted of a lesser charge to begin with," the prosecutor did not question him about the plea. N.T., 7/13/2010, at 60. However, Gerber brought up his

prior plea again, commenting that if he had backed over the victim a second time, like the Commonwealth claimed, he "would have took the deal [the Commonwealth] offered [him]." *Id.* at 69. Because Gerber brought up his prior guilty plea, unsolicited by the Commonwealth, on two occasions, we agree the Commonwealth's follow-up inquiry was permissible. Moreover, as noted by the PCRA court, the trial court provided the jury with a cautionary charge, instructing them to "disregard any evidence that [they] heard regarding the prior disposition of this case,"[13] and we must presume the jury followed the court's instructions. **Brown**, *supra*. Accordingly, we agree with the PCRA court's conclusion that this claim has no arguable merit.

Nonetheless, it merits mention the PCRA court also found counsel had a reasonable basis for failing to object to this line of inquiry. **See** PCRA Court Opinion, 9/26/2016, at 41-42. Indeed, at the PCRA hearing, trial counsel explained:

> [O]nce it was blurted out, I was going to see where it was going. And where it went, if my recollection is correct, was that Mr. Gerber – I had anticipated and I think I was correct – Mr. Gerber was going to get out that a plea was offered to him, that he only took it because his lawyer had died and that the Commonwealth had offered him a plea to third-degree murder.
>
> He was attempting, and I believe he testified, around a situation of the plea that you guys wouldn't have offered me the plea if you didn't think that it was third degree or whatever.
>
> I felt strategically that what the jury was going to hear was that a plea was offered, that the only reason Mr. Gerber took it

---

[13] N.T., 7/13/2010, at 288.

was because he felt pressured because his lawyer had died, that he had appealed it, that it was overturned, but that the Commonwealth on the other side had offered that plea because they felt that their case was weak or that they had a problem with the intoxication defense or the self-defense or whatever. That was the reason I did not object. That was also the reason why I asked some additional questions on [redirect]-examination to try to get that out to the jury.

* * * *

… I didn't want it to come out when Mr. Gerber was testifying. And he was instructed that it was not going to come out, but he brought it out himself. Once he did that, then, yes – I decided that once it was out, that I was going to use it to his benefit. Because he had withdrawn the plea, and it was upheld that it was improperly, you know, entered, that he was, you know, pressured into taking it because of what he felt.

But that didn't, you know, diminish the fact that an agreement is just that, an agreement between both parties. And the Commonwealth had also agreed that it wasn't first-degree murder. So, yes, I wanted the jury to hear that. Once it was out there and once we were in that position, I felt that was the best alternative to do.

N.T., 5/25/2016, at 103-104, 105-106. Counsel's stated basis for failing to object once "the bell was rung" constitutes a reasonable defensive strategy. Consequently, we agree Gerber's fourth challenge to counsel's ineffectiveness fails.

In his final claim, Gerber insists that even if this Court concludes his individual claims do not warrant relief, "collectively the prejudice to him from all of these various failures of trial counsel was in combination so great that a new trial must be nevertheless awarded." Gerber's Brief at 58.

It is axiomatic that "no number of failed [ineffectiveness] claims may collectively warrant relief if they fail to do so individually." *Commonwealth*

- 31 -

*v. Johnson*, 966 A.2d 523, 532 (Pa. 2009) (quotations omitted). Nevertheless, our Supreme Court has clarified "that this principle applies to claims that fail because of lack of merit or arguable merit." *Commonwealth v. Spotz*, 18 A.3d 244, 321 (Pa. 2011) (citation omitted). Rather, "[w]hen the failure of individual claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed." *Id.* (citations omitted).

Here, we have concluded that all of Gerber's claims failed because they either lacked arguable merit, or counsel had a reasonable basis for his actions. Therefore, having not reached the prejudice analysis for any of his claims (save one), we need not consider whether the cumulative prejudice of his allegations of error justifies a new trial.

Order affirmed.

*Judgment Entered.*

![signature]

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>11/21/2017</u>